8 U.S.C. 1373, signed into law over 20 years ago by President Clinton, serves to encourage information sharing between local and state law enforcement officials. Despite the law's aim, in 2016, the Inspector General for the Department of Justice expressed concern that many states and localities that were receiving federal grants were nonetheless not complying with the terms of 1373. Against that backdrop, a 2017 Executive Order instructed the Attorney General and the Secretary of the Department of Homeland Security, the two Cabinet officials charged with enforcing Section 1373, to utilize their legal authority to enforce the statute, including their authority to place conditions on grants that require compliance with the law 1373. The Executive Order does not rewrite the law, it does not invoke new powers, and it does not instruct justice or DHS to engage in unconstitutional activity. In fact, the Executive Order does just the opposite. At every turn, the Order states that it shall be implemented, quote, consistent with law, an approach the Attorney General has himself reconfirmed, both in court and in directives to the Department. And in its decision blow in joining enforcement of the Executive Order, the District Court erred in at least three fundamental respects. The first is that the District Court enjoined the Order before any action had been taken under it. It was a directive to two Cabinet officials to use their discretion to study the law and Second, because none of that had happened, the Court should have viewed this as a facial challenge to the Executive Order. There was no as-applied conduct here to review. The appropriate standard, then, was a facial challenge. And whatever sort of unconstitutional applications of the statute one might dream up, there are myriad constitutional applications of the statute, or of the Executive Order, which is confirmed by the fact that there are other cases being litigated right now addressing the Department's authority to enforce 1373, cases in San Francisco, in Philadelphia, and Chicago. And all those judges so far have allowed the case to proceed and that the Attorney General to, at the initial level, enforce his authority under 1373. Do you think the President has the authority to impose conditions on a grant that Congress did not authorize? Well, that would be governed by the terms of the statute setting forward the grant. And in this particular case, we're talking about the grants that, under DOJ control, that you referenced at the preliminary injunction hearing, the JAG grants, SCAP, and I think the COPS grants. Yes. What's the status of those? Well, the one that's been litigated by far the most is the Byrne JAG grant. Again, there was litigation in Chicago, Philadelphia, and San Francisco. And in each of those, in Chicago, the District Court rejected the city's request for a plenary general from placing 1373 conditions on the grants. In San Francisco, Judge Orrick did the same, denied a preliminary injunction. And we're now developing a record about whether San Francisco and the state of California are in compliance with 1373. And in Philadelphia, the same thing. We're developing a record to determine whether the city of Philadelphia is in compliance with 1373. So your position is, at least with respect to those three grants, that the Attorney General has the power to impose a condition that's not authorized by Congress? Our position is that the Congress has authorized those conditions. With respect to the Byrne JAG grant, the grant said that the Attorney General can impose as conditions applicable laws. And the Attorney General determined that 1373, which has at its roots law enforcement and immigration, is a law applicable to law enforcement-based grants. And so we believe that the Attorney General does have the statutory power to do that. And in fact, no court has so far said that we don't. And so is it the Department's view that the city and county of San Francisco is in noncompliance with the statute 1373? Yes. So that actually begs a very important point, which is that with respect to all these grants, there's an administrative procedure that takes place. So if there's doubt about whether a grant recipient is in compliance with the terms of a grant, there's first an administrative procedure that takes place. That process is undergoing. There's been significant communication back and forth between San Francisco and the Department about their compliance. And we're now litigating those issues in the district court. Our view is that the litigation was premature because the administrative process had not yet concluded. And that's still ongoing, but we have parallel litigation going on at the same time in the district court. Well, we know from Virginia v. American Booksellers that you can have action with the threat of prosecution. And here we have a lot of statements being made by the President and others that he wants to withhold grant money from sanctuary cities. What are we to make of that? I think that's right. Obviously, there's no enforcement action that had taken place. So we think about the Anchorage case decided by the Alamban Court here. There was no action taken here, no action threatened by the Attorney General or the Secretary of Homeland Security. Their charge was to study the law and to see what restrictions they might be able to take place. The Attorney General did that, and now he has imposed some conditions. And there's no history of enforcement under this Executive Order either. It was obviously a new order. So this doesn't satisfy, in my mind, any of the criteria set forth in the Anchorage case. But I think you draw attention to another key issue in the case, and that is that the order has to be judged by its terms, and that was not by public statements. And that was the third point I wanted to get to about the error below, and that the district court, rather than looking at the expressed terms of Section 9A, which is the relevant part of the order that was enjoined, the court looked to other parts of the Executive Order and then, at the plaintiff's urging, looked to statements that were made. Many were made before the order issued, even before the election last year. Some were made by the White House press staff. That obviously doesn't trump, one, what's in the order itself, and two, how the Attorney General has interpreted it, because the United States in court, of course, speaks through the Attorney General. And the Attorney General, one, said in court that our reading of the Executive Order is that this is a charge to DHS and to justice to look at our grant authority. And then, two, and there was some question about whether that was sort of a binding statement because I gave it in court and it wasn't the Attorney General. The Attorney General initiated a directive to the Department of Justice explaining how the Executive Order should be interpreted. So there's no doubt, when you look at the terms of the order coupled with the legal position that the United States has taken, that this is exactly how the order should be enforced. And that's consistent... But doesn't... I take your point, but I think the district court was really relying on those statements in terms of justiciability, not necessarily interpreting the order. Do you agree with that or you disagree with that? I think it probably looked to both, but there again, many of those statements talked about a general policy to not provide federal funds to funds recipients that were violating federal law. That seems to me to be a quite non-controversial proposition. Many of these comments were not directed specifically at Section 9A, which is, again, about one statute. It's about 8 U.S.C. 1373. It makes that very clear at the beginning of the preamble in Section 9, and then Section 9A talks about two agencies enforcing that statute either through grant restrictions or through enforcement actions, which would be, generally speaking, preemption actions. So the comments don't really match up to the actual language in the order that was enjoined and was perceived to be a threat to the cities. And I think the D.C. Circuit's decision in Arbol, which is cited in our brief at pages 26 to 29, is really on point in that it's a very similar executive order. It was a non-self-executing executive order. So this order itself was just a direction to other agency officials to study the law and to take the actions that they deemed appropriate. In that executive order in Arbol, it said that it should be implemented to the extent permitted by law. And so the Court accepted that to mean that the agency should act only if it was taking legal, proper action. The executive order said that it was — it involved bids that would be made to the time that a claim would be ripe. So because the order instructs something, the actual time to challenge it would be, one, if there's any action taken under the order, and then, two, did that action harm a potential plaintiff. In that case, too, there was a question about how you would read the order. And the government disowned a sort of one — one potential reading of the — of the order, and the Court accepted that. And we would ask the Court to take yes for an answer, just like we've asked the plaintiffs to do that, too. We've articulated time and again how we're enforcing the order, and we would ask the Court to accept that. You didn't brief the constitutional issues particularly. If the district court's interpretation of the order is correct, would you agree that the executive order is unconstitutional? I would say two — two responses to that. First off, if there are funding restrictions that are made by the executive branch where there's no statutory authority to do that, then that may well run afoul of the Constitution. Now, we think there is authority for the actions that have been taken, but — but certainly as a general proposition, there are limits on the ability of the executive branch to take extra statutory action to limit funding. But the — but the converse of your question is true, I think, as well, and that is that the plaintiffs have agreed that if our reading of the statute is correct, that we should prevail and that there should not have been an injunction. And when you look at the terms of the order again, I think our reading is by far the better one. With respect to Section 9A, again, it refers to DHS and DOJ specifically. It doesn't make any reference to other Cabinet officials, so there was a concern here that Medicaid money would be at issue or transportation funds, but there's no mention of those agencies in Section 9A itself. And so it's really not fair to read that section as threatening funds other than the grants administered by DOJ and DHS. So why do you care if there's an injunction against the actions that you're disavowing? Well, two responses. The first is why did the plaintiffs seek an injunction where there was no harm to them? I think that's the real question here, which is what was the harm that was going to flow to the plaintiffs? They didn't establish any concrete irreparable harm, and so there should have been no injunction to begin with. But the reverse side of that, any time an executive action is enjoined, I think the government would claim harm from that. Because of the injunction, we were then forced to go back to court to clarify what it is that the injunction covered and didn't cover. The Section 9A allows the Secretary of Homeland Security to designate sanctuary jurisdictions. That has been enjoined. That's an injury to DHS. So there is harm that flows from the executive order, but I really think the better question is what was the harm in the first instance to the plaintiffs that they had experienced from the issuing of an executive order, a non-self-executing executive order? And I think it was none. Counsel, Judge Gould, if I could ask you a question, please. Yes. Let's assume that there was an order that said that an Attorney General could cut off aid to a sanctuary jurisdiction on matters such as hurricane relief under FEMA or aid to higher education from some relevant agency or medical aid for seniors. If the law said that the AG could cut that off to any jurisdiction that didn't comply with 1373, would that be constitutional? Thank you, Judge Gould. By law, you're referring to an executive order or an act of Congress? An executive order. An executive order. So that sounds to me like, again, a non-self-executing executive order. So it's not the President invoking his own powers. It's a direction to a Cabinet official to take certain action. And unless there's absolutely no constitutional application of that executive order, and the one you hypothesized about sounds like it could have some constitutional application to others that are not, unless there's no constitutional application of the statute, then we always typically wait to see whether any action occurs, and if so, what the impact is. And there are many tools available, of course, to plaintiffs to come to court in a very necessary. And this executive order, I think it's worth reminding, again, had a number of contingencies included in it. Chief among those is that it was that the Cabinet secretaries had to utilize their discretion to determine, one, which grants they think even they would want to apply conditions to, two, they were authorized to do so consistent with law, so they certainly had to review their legal obligations and legal authorities. There was a carve-out for law enforcement concerns if there were grants that, while maybe 1373 might be an appropriate condition, but the grant was too important with respect to law enforcement, then the Cabinet officials had to weigh those issues and potentially not impose a condition. And they also had to assess 1373 for willful violations. That's another expressed term in the executive order. So there are a whole host of contingencies here to the Cabinet officials in terms of what grants, if any, would be at issue. I will talk to you briefly then about the relief that was issued here by the district court, because even if the court agrees that the order ran afoul of some constitutional concerns, certainly a nationwide injunction was well beyond the relief appropriate in this case. And that's both for Article III standing purposes and for the general equitable powers of district courts. I think we're all very familiar with the general rule is that the equitable relief should be tailored to remedy the asserted injury, but should not go beyond that. And a host of cases from this court, Los Angeles, Haven, Easy Riders, Bregsel, and Zepeda are just four of the ones we cited, make clear that the relief should be appropriate to remedy the injury asserted by the plaintiffs, but absent a class action should not go beyond that. And here, my friends on the other side have put forward no theory as to why they need a nationwide injunction to remedy their injuries. If you think injunctive relief was appropriate, what was necessary then was to craft a remedy that restricted enforcement of the department's, the respective department's powers with respect to these two cities, but not to go beyond that. And there's a host of cases that make that clear. There certainly are other cases where we dispute about the scope of the relief needed to remedy an injury. And so the travel cases that Judge Gould is familiar with, in those cases the parties disputed what range of relief was necessary, and the department had a different position than what the court ultimately arrived at. But that is a stark instance from this case, where there's no doubt that the relief that's necessary is just to restrict enforcement with respect to these two cities only. And I will say before I sit down that whatever concern there was at the preliminary injunction stage about ripeness and how this executive order would be read and that sort of thing, and there was a lot going on at that time, we're now at the permanent injunction stage. And the district court thus had before it, one, the history of what the attorney general did with respect to these grants under his own statutory authority. The court had before it the instruction that the attorney general gave to his department. And all of those matters have to be considered by the court at the permanent injunction stage. So even if the court thinks that there was a basis for a preliminary injunction, at this point, there is no indication that there needs to be a permanent injunction permanently enjoining this executive order. And I think the record bears that out. Thank you, counsel. Thank you. Thank you, Chief Judge Thomas. I'm Christine Van Aken for the City and County of San Francisco. I'll be sharing my time with Danielle Goldstein of the County of Santa Clara, so I will endeavor to watch my time carefully. This executive order claims powers that the President doesn't have in an unconstitutional effort to coerce cities into changing their sanctuary policies. I have two primary points, one about the interpretation of the order, and second, about even crediting the attorney general memorandum that San Francisco and Santa Clara are nonetheless entitled to relief. On my first point, the interpretation of the executive order. This executive order is simply not susceptible to the post-litigation gloss that the Department of Justice has placed on it. But even if it were, ordinary tools of interpretation would compel the conclusion that it commands unconstitutional action. The order itself is not simply a command to use the discretion that Congress has given to the executive in a certain way. Rather, it claims the power to deny, in Section 2, it claims that the policy of the federal government is to deny federal funds full stop to sanctuary cities. And then in Section 9A, it directs the attorney general and the Secretary of Homeland Security to deny federal grants to sanctuary cities, except as they deem it necessary for law enforcement purposes. Now, it's true that there's a proviso that they should exercise their power consistent with law. But what are we to make of that when the entire premise of the order is that it is the President who has the power to impose conditions on grants and federal funds and not Congress? Moreover, in the ordinary course, when you see boilerplate language like to the extent consistent with law or notwithstanding any other provision of law or language like that, you don't expect to find the vast majority of operative applications to be covered by the savings clause, and for the operative language of the executive order to cover a very small share of the cases. That's just not how we ordinarily read an order. And so taken with an order like this, it's quite understandable that cities across the country viewed it as an existential threat to their funding and took action accordingly. But even if you didn't look only at the plain text, it would be appropriate to look at the words of the President and the words of officials charged with carrying out this order to understand what it means. And those words make unmistakably clear that the point of this order is to use federal dollars as a weapon to defund sanctuary cities that don't comply with policies that the President prefers. So I think it's not a fair reading to say the Attorney General memorandum is the only permissible interpretation of this order. I think let me move to my second point, which is that even if you credit the Attorney General memorandum for what it is, and I'll explain what that is, that San Francisco and San Clara are nonetheless entitled to relief here. Let me explain. I think that the plain reading and, of course, what we know from outside the four corners of the text teaches that the President had a very broad purpose with the executive order, which was to compel cities to change their policies. And I think that perhaps cooler heads at the Department of Justice realized that this order couldn't be enforced in its entirety and so that the Sessions memorandum is what it purports to be. It says at the top that it's a directive to grant-making components of the Department of Justice, and it says this is how we're going to implement this executive order. The problem with that is that it doesn't cure the harms that San Francisco and other cities face. It's directed only to the Department of Justice's grant-making components. It has no effect on any other agency of the federal government. It certainly has no effect on the Department of Homeland Security. We know that the President continues to intend the executive order to defund sanctuary cities, and we know that the Department of Homeland Security, whom even Mr. Radler acknowledges is subject to the direction of the executive order to deny funds to sanctuary cities, interprets the order differently than the Attorney General memorandum. We have the statements of the acting director of ICE, Thomas Homan, in congressional testimony, where he says that what this order does is it allows the Department of Homeland Security to defund to defund grants to cities that don't honor detainers and don't allow ICE access to their jails. Now, that is not the interpretation that the Attorney General memorandum gives it. So even if you credit that memorandum, I think you should treat it only as a directive to grant-making departments within the Department of grant-making components within the Department of Justice to implement this order in a certain way. And we have nothing from the Department of Homeland Security to dispel the statements of the acting director of ICE, who tells us that they're going to interpret this executive order very differently. And I think this is actually remarkably similar to the Washington v. Trump case, the first travel ban case, where the court was faced with a very broad executive order that purported to deny the ability to reenter the country to holders of green cards to lawful permanent residents. And then there was a statement from the White House counsel that purported to be an authoritative interpretation of the executive order that said, no, no, no, it doesn't apply to green card holders at all. And this court, quite appropriately, was skeptical of that and said, you know, the White House counsel just doesn't have the authority to rescind an executive order. Similarly, the Attorney General does not have the authority to rescind this executive order, nor bind other departments within the Federal government to his version of the executive order, at least not in an internal memorandum like this that isn't even addressed to other divisions or, I'm sorry, other Federal agencies. So let me turn to the relief. Mr. Radler closed with a claim that an injunction is not appropriate here anymore, because perhaps in the heady first few days of the administration, there was confusion about the scope of the President's powers, and an overly broad order was issued, but there's no reason to think today that that order will be enforced consistent with its terms. I submit that that's very cold comfort. The harm to cities is ongoing. I think Ms. Goldstein is going to speak more to that. But in particular, San Francisco has submitted undisputed evidence that against the possibility of losing massive amounts of Federal funding, it is reserved money that would otherwise be spent on social service programs, important public work that is now being reserved as a hedge against the prospect of defunding, and, moreover, the coercive effects of the executive order persist. Cities are entitled to know what the law is and to sort of be told, trust us, when this executive order claims this very broad power, and when Federal officials continue to assert that they will exercise this very broad power, is not a sufficient remedy. And even if the Court thinks that there's no prospect that irreparable harm or an unlikely prospect that irreparable harm is going to continue to be inflicted on cities and that everyone is just going to follow the Attorney General memorandum, I submit that we shouldn't be required simply to trust the Federal Government on this. And the Court's mootness cases teach us that. Those cases demonstrate that where a defendant comes to the Court and says, I have stopped, I have ceased this illegal conduct, the Court doesn't simply accept those representations unless it is absolutely convinced that the harm isn't going to continue. But here we have continuing threats and continuing representations that there is a prospect that this executive order will be enforced. And so in that case, I submit that at a minimum, San Francisco is entitled to declaratory relief that says, you know, consistent with Judge Oryk's orders, this executive order cannot be enforced farther than the Attorney General memorandum. And as this Court has pointed out, as you pointed out, Chief Judge Thomas, in your questions to my colleague, Mr. Radler, there's absolutely no harm to the Federal Government from being confined to an interpretation that it apparently believes it can live with. If there are no questions for San Francisco, I will cede my time to Ms. Goldstein. Well, I have one question, counsel. Yes, Your Honor. That is, why would there be an interest of San Francisco in having this injunction be nationwide? So I think San Francisco, at a minimum, has an entitlement to an injunction that extends as far as California, and that's because some of the funds that we receive from the Department of Justice and from other Federal agencies flow through California. So certainly our relief is not complete if an injunction doesn't extend at least statewide. I think beyond that, it's a matter of district court discretion. The district court here found that facts about the appropriateness of an order like this wouldn't vary from jurisdiction to jurisdiction. And so in those cases, courts have appropriately entered very broad injunctions. And the Article III limit on that, we think, is that an injunction can't be broader than the geographic scope of the harm, and clearly the harm here from this executive order is nationwide. But we think it's a matter of district court discretion rather than power. And the Federal Government here, certainly where they don't claim that they are harmed in any way from this injunction other than not being allowed to do things that they can't do anyway, that there's no reason not to leave the injunction intact. Thank you, counsel. Thank you. We'll hear from Santa Clara. Thank you, Your Honor. And may it please the Court, Danielle Goldstein, Deputy County Counsel, on behalf of the County of Santa Clara. I want to make three points here that I think will clarify some of the issues that have come up so far today. The first is, in response to Mr. Riedler's question, what's the harm to the counties here as long as enforcement of this executive order is out in the future somewhere? The second is, in response to Mr. Riedler's point, that if there's any constitutional or any lawful implementation of Section 9a, that saves the command of Section 9a. We think that's not right. And the third is to just consider what the county and local jurisdictions around the country are left with if this Court withdraws the relief that was entered by the district court. So I'll start with the harm. This isn't a case where the harm to local jurisdictions is theoretical or speculative or even in the future. The constitutional harm and unconstitutional coercion that resulted from this order was immediate and actual. It put local jurisdictions to a daily choice whether they were going to hold to policies that were adopted by local elected lawmakers to protect local health and safety on the one hand, or on the other hand, risk financial ruin. That wasn't an accident. This executive order was both expected and intended to cause exactly that kind of coercion. The White House repeatedly underlined that the executive order was a tool to, quote, end sanctuary cities. On January 28, 2017, days after the executive order issued, the White House press office issued a press release saying that President Trump signed an executive order to ensure that immigration laws are enforced throughout the United States, including halting federal funding for sanctuary cities. So jurisdictions like San Francisco and the county of Santa Clara were able to seek relief from this coercion because we had the resources to do it. But we saw the executive order operate exactly as it was intended on other local jurisdictions that had targeted policies. So for example, Miami made the determination that it couldn't risk the catastrophic defunding that the president said was at issue here when he issued this executive order. And when President Trump heard about this, he didn't tell the city of Miami that they had got the executive order wrong or they had misinterpreted it. Instead, he told Miami and the country that Miami had made the right decision. Now, the county of Santa Clara likewise was forced to choose. Was it going to risk financial ruin by continuing to provide the life-saving health and safety services to the tune of $4 to $5 million a day with these federal program funds? Was it going to stop providing those services, protecting its fist, but abdicating its public responsibility? Or was it going to abdicate its governmental function in a different way by abandoning its local elected lawmakers' policies that had been adopted to protect law enforcement within the county? And if the injunction here is lifted and declaratory relief isn't entered, the county is going to be in exactly the same position, except for a litigation position of the Department of Justice and a one-and-a-half-page memorandum from the Attorney General that doesn't even purport to bind the entire Department of Justice, much less any other federal agency. Now, against this backdrop, the Department of Justice doesn't defend the breadth of the President's statements or the wide command of the executive order. Instead, it's offered an interpretation of the order that inverts its language and policy and flies in the face of its author. The defunding command of Section 9A has three parts. It has a command, it has a single limited exception, and it has a caveat, boilerplate phrase to the extent consistent with law. The command is that the Attorney General and the Secretary of Homeland Security shall ensure the jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 parent sanctuary jurisdiction are not eligible to receive federal grants. The single exception is for those grants that are deemed necessary for law enforcement purposes by those officials. To be sure, it winds up to that command with the phrase, in their discretion, to the extent consistent with law, but that simply can't bear the weight that the Department of Justice wants to put on it. And I think Judge Oreck, at the preliminary injunction hearing, really put a fine point on this with a nice hypothetical. He asked Mr. Riedler if an executive order that barred the Federal Government from selling excess Federal property to African Americans, quote, to the extent consistent with law, would be constitutional. And Mr. Riedler wisely agreed that that would be a hard executive order to defend. But the Department of Justice's position in this case amounts to the idea that you could defend that executive order if there might coincidentally be some African American or handful of African Americans who were otherwise debarred from purchasing excess Federal property. That just can't be right. Now, I should be clear, we do not believe that there is any circumstance where Section 9A could lawfully be implemented. But even if you believed that that was not true, to the extent consistent with law simply can't mean what the Department of Justice needs it to mean here in order to prevail. And the Supreme Court has made that clear repeatedly, that you can't use a rote phrase that doesn't have specificity or substance to override or render unrecognizable the rule or the substance of a text. Now, I think there's another reason that the Department of Justice's interpretation here has to fail, and that's because it's plainly not what the President, who authored and signed this order, wanted this executive order to do. He was extremely clear that he wanted this executive order to be a weapon to end sanctuary jurisdictions. As Mr. Riedler acknowledged at the preliminary injunction hearing, the Department of Justice's reading of this executive order diffuses that weapon. As he put it under the Department of Justice's reading, Section 9A applies to a very narrow range, a very narrow range of money. It's a very, very or, sorry, very narrow range of funding. It's a very, very small money. It doesn't make sense to assume that the President, who authored and signed this order and described it in sweeping terms, intended it to do essentially nothing. It makes much more sense to assume that the author of this executive order simply was mistaken about whether and to what extent the command of the order could actually be implemented, quote, consistent with law. And that's certainly much more consistent with the record that we have in this matter. So I want to close with just a thought about what we're left with if the Court withdraws the relief that was granted by the district court in this matter. As I mentioned, what we have is the Attorney General's memorandum, which my colleague well described the limitations of. It wasn't even issued to the other agency that even under the Department of Justice's very narrow reading is charged with implementing Section 9A. We don't actually know what the Department of Homeland Security thinks about this reading. And I want to make another note, which is that we've seen just between the district court and now that the litigation positions of the Department of Justice aren't always the final word on how the grantmaking components interpret Section 1373 or the county's the threats to the county. Mr. Riedler represented to the district court at the preliminary injunction hearing that he didn't think that Santa Clara violated Section 1373. At the motion for at the hearing on the motion for summary judgment, his colleague Mr. Shoemate pointed to the fact that the Department of Justice hadn't issued a 1373 compliance letter to the county as evidence that there was no standing in this matter. Months later, the county received exactly such a letter and one that disagreed with the view that the county didn't violate 1373. Finally, there are many things that the administration could have done that might meet the voluntary cessation standard to bind itself to the interpretation that's in the Attorney General's memorandum if that's in fact what it intends to do, what the President intends to do. For example, it could have, and we've seen it do this before, withdrawn the executive order and issued a new executive order. But they haven't done that. Instead, they've doubled down on this order, asking that the court keep it fully intact while doing very little to actually bind themselves to the Department of Justice's current interpretation of it. And that has the impact of keeping the coercive effect and the harm to local jurisdictions of the executive order and the President's threats in place for as long as possible while insulating the coercion from judicial review. We think for these reasons and those set forth in our brief that this court should therefore affirm the district court's order on the motion for summary judgment. Thank you. Thank you, counsel. A few brief points on rebuttal. First of all, my friends asked about the position of DHS, and I'm telling the court that DHS agrees with the interpretation put forward by the Attorney General. There was a comment made about a statement given by an ICE director about detainers. Detainers, there's 9A of the executive order says nothing about detainers. 9B does. Yes, correct. 9B was not, two points about that, Your Honor. One, 9B was not enjoined. And two, 9B is just a command that the Secretary list those jurisdictions that have not complied with detainer requests. It doesn't impose any financial consequences as a result of not complying with the requests. I'm puzzled by that because many of the public comments have been focused on the detainers. And the DOJ's position, as you represented, is that has nothing to do with funding withdrawal and that funding could not be withheld from the cities based on noncompliance with a detainer request. Is that DOJ's position? Well, detainer can sometimes mean different things. If we're talking about the sort of post-holding someone an additional period of time beyond their sentence, then that's not part of 9A and we have not asked jurisdictions to do that with respect to our grant conditions. I think you and I understand what detainer requests are. They're requests, it could be from Federal to State, State to Federal, that are just simply requests to hold somebody because you may charge them, right? Correct. There's no, they're typically. You would agree that that's completely discretionary with the holding authority? Well, there are a couple restrictions on the holding authority. One is Section 1373, which bars a city from having a blanket policy that refuses cooperation with respect to information sharing. So the law does prohibit the city from never allowing its employees to ever share release date information with the government. And then two, some of the grants are including restrictions that are affirmatively requiring that sort of assistance. But I think the main point about detainers is detainers is not part of 9A. There might be constitutional questions about a 48-hour hold, an additional holding period. The Fifth Circuit just said there was no constitutional problem with that. But the main point is that's not part of 9A. What I'd like to focus on for a moment is Section 2C, because this was the portion that my friend stood up and read to the Court to say that this created all of the alarm and is the reason why there should be an injunction here. Again, first off, 2C was not enjoined. It doesn't purport to interpret 9A. And here's what 2C says. It says to ensure that jurisdictions that fail to comply with applicable federal law do not receive federal funds. I'm not sure who objects to the idea that someone who doesn't comply with the law shouldn't get federal funds. That's all that section says, except that it also says, except as mandated by law. So that could hardly be a direct threat to take away all of your federal dollars for a host of reasons. And again, that part was not enjoined. It has nothing to do with interpreting 9A, which is very limited. I just would then close with two things. One, the Attorney General memo, there's been a lot of discussion about that. The Attorney General memo was not needed because the 9A itself is directed to two Cabinet officials. There was some concern that perhaps this was an instruction to the Attorney General to call all the other Cabinet officials and to tell them not to issue grants using his legal authority. And that's the only reason the Attorney General issued the memorandum was to clear that up. That was not his interpretation and that was not the case. So the case doesn't really turn on the memo itself. It turns on the terms which we've described. But the memo is just belt and suspenders. And the final point I'll make as my time is running out is that with respect to the relief here, I think my friends on the other side conceded that there's no need for a nationwide injunction here to get them relief. And they made the point that the injunction should stand statewide. But I'm not sure I heard a particularly persuasive reason as to why they need statewide relief either. Certainly an injunction that's tailored to the grants potentially received by Santa Clara and San Francisco would be enough to fully remedy their injury. Thank you, Counsel. Thank you. Thank you both for your arguments today. The case just heard will be submitted for decision and will be in recess. All rise.
judges: Fernandez, Thomas, Gould